Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Attorneys for Plaintiffs Compass, Inc. and Compass California II, Inc.

(Additional counsel on signature page)

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| COMPASS, INC. and COMPASS CALIFORNIA II, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>BRIDGEMLS, INC.,<br><br>Defendant. | Case No. 4:26-cv13647<br><br>**COMPLAINT FOR VIOLATION OF 15 U.S.C. § 1 AND RELATED CAUSES OF ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1. Homeowners should be free to choose how to sell their own homes without having a competition-killing real estate industry organization tell them how to do it. Real estate agents should be able to compete fiercely to be hired by clients, and real estate brokers should be able to compete to attract agents to their firms, without their competitors banding together to restrict how they compete. In dozens of cities across the country, homeowners and agents are free to do that. But this much-needed competition and choice are blocked in Alameda and Contra Costa Counties (the "East Bay") and the other Northern California counties that Defendant BridgeMLS, Inc. ("BridgeMLS") claims as its service area because of rules set and enforced by BridgeMLS. BridgeMLS is a combination of competing real estate brokers and agents, and through its rules those brokers and agents dictate how Compass and its agents can and cannot compete, how Compass and its agents can and cannot serve their clients, and how homeowners can and cannot market their own homes.

2. Homeowners want a choice. Plaintiffs Compass, Inc. and Compass California II, Inc. (collectively, "Compass") offer a phased marketing strategy, See It First™ on Compass, that gives homeowners that choice. Some homeowners choose to use a multiple listing service ("MLS") to market their homes. Some want to publicly market their homes before they go into the MLS—through internet websites, yard signs, social media, and newsletters, among other public marketing methods. Compass and its agents do not force homeowners to use phased marketing or any other strategy; in fact, Compass requires the homeowners' written approval to publicly market outside of BridgeMLS. Under California law, homeowners are entitled to decide how to market their own properties.

3. One reason homeowners like having this choice is that they can use pre-MLS public marketing to test the price of a home with real-world feedback from agents and their clients, which helps ensure the home is not overpriced when it lists in the MLS and the MLS sends the listing to every real estate website and data vendor in the world. Moreover, this strategy helps agents and their clients gather feedback on price without the risk of their listings being permanently soiled by price cuts and extended "days on market" that hurt the perceived value of the homes. Homeowners

love this choice: where MLSs allow phased marketing, approximately 48% of Compass homeowners used it. Even when publicly marketed pre-MLS, the vast majority of those listings actually sold in the last phase (after being submitted to the MLS). Compared with listings sent straight to the MLS, as BridgeMLS requires, homes using phased marketing have sold for 4.6% more, with 34% fewer days on the MLS and 29% fewer price cuts.

4. BridgeMLS, a Berkeley-based MLS wholly owned by the Bridge Association of REALTORS®,[1] is a combination of competing brokers and agents, including Compass' direct competitors, and it is governed by a Board of Directors made up of practicing real estate brokers and agents. Under BridgeMLS Rules 7.5 and 7.5.1 (the "Anticompetitive Rules"), once a homeowner markets the home anywhere on the internet, posts the home anywhere on social media, holds a single open house, shares the listing through a multi-brokerage listing sharing network, or publicly markets the home in any other way BridgeMLS defines as public marketing, the listing must be given to BridgeMLS and its co-conspirators within one business day, and the agent and homeowner must follow hundreds of BridgeMLS restrictions—even if the homeowner gave the agent a lawful marketing instruction that conflicts with BridgeMLS's rules.[2]

5. Although California law states that real estate agents owe their clients a fiduciary duty of "utmost care, integrity, honesty, and loyalty," including a duty to follow their lawful instructions,[3] if a real estate agent follows the client's lawful instruction to publicly market a home outside of BridgeMLS, the agent then faces escalating fines of up to $1,000 per violation, disciplinary hearings, and potential suspension or expulsion from the very MLS they need to do business.[4] More than 40 years ago, in its seminal report on U.S. residential real estate, the U.S. Federal Trade Commission ("FTC") warned that when an MLS forces members to submit their listings,

---

[1]Rule 7.1 Statement, *Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc.*, No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 22, 2026), ECF No. 9 ("Bridge Association of REALTORS owns 100% of Plaintiff BridgeMLS, Inc.").

[2]BridgeMLS, Rules and Regulations, Rules 7.5, 7.5.1 (eff. June 2026) ("BridgeMLS Rules").

[3]Cal. Civ. Code § 2079.16; *Thomson v. Canyon,* 198 Cal. App. 4th 594, 607 (2011).

[4]BridgeMLS Rules, app. A, Citable Infractions § 2.1.1 (rev. Dec. 2025) ("Appendix A"); BridgeMLS Rules 7.17.2, 14.1–14.4, 17.1.

"[a]lternative methods of selling houses are effectively foreclosed."[5] That is what BridgeMLS has done.

6. Compass brings this lawsuit to stop these illegal rules. Competitors may not band together to dictate how their rivals serve customers and deprive homeowners of choice. Yet that is what BridgeMLS is doing: using control of a home listing database that real estate agents in the East Bay cannot work without, BridgeMLS and its co-conspirators block Compass's better home marketing product to protect Compass' competitors from having to compete with Compass on the merits for clients and agents.

7. Instead of fixing its anticompetitive rules, BridgeMLS has continued to enforce them against Compass agents and, when Compass demanded that it stop, sued Compass. BridgeMLS's excuses for punishing agents for phased marketing are meritless. In fact, MLSs serving more than 350,000 brokers and agents in at least 12 states do not fine or punish pre- or off-MLS public marketing, and in these markets, the issues BridgeMLS claims will result from pre- or off-MLS public marketing have not transpired. On information and belief, until May 2020, BridgeMLS's own rules allowed a homeowner to keep a listing out of the MLS without restricting how the home was publicly marketed.[6] But now, in a lawsuit it filed in New York in anticipation of this one, BridgeMLS claims that its rules protect "transparency" and prevent "free riding."[7] BridgeMLS does not care about homeowners; it is a members-only database that homeowners are unable to access and that fines agents just for following their client's lawful public marketing instructions. Moreover, Compass does not "free ride" as BridgeMLS claims. Compass agents pay BridgeMLS dues and contribute their listings to BridgeMLS.

---

[5] FTC, The Residential Real Estate Brokerage Industry 130 (Dec. 1983) ("Butters Report").

[6] See Clear Cooperation Policy – MLS Rule Change 7.5, CCAR (Apr. 30, 2020), https://ccartoday.com/clear-cooperation-policy-mls-rule-change-7-5 ("2020 CCAR Clear Cooperation Announcement") (announcing that CCAR was working with its "MLS partners (Bay East & bridgeMLS)" ahead of the "May 1st implementation date of the new Clear Cooperation MLS Rule"); MLS Clear Cooperation Policy, Bay East Ass'n of REALTORS®, https://bayeast.org/mls-clear-cooperation-policy/ (identifying the effective date of Bay East's Clear Cooperation rule as "May 1, 2020").

[7] Am. Compl. ¶¶ 4, 55, 77, 80, Ariz. Reg'l Multiple Listing Serv., Inc. v. Compass, Inc., No. 1:26-cv-09253-MKV (S.D.N.Y. Oct. 30, 2026), ECF No. 28 ("S.D.N.Y. Am. Compl.").

8. BridgeMLS and its co-conspirators have caused significant economic harm to Compass and its agents, in addition to the immense harm BridgeMLS has caused to homeowners. Compass seeks treble damages, to the full extent allowed by the law, for every dollar of harm BridgeMLS and its co-conspirators caused Compass. Compass paid over $175 million to defend and settle lawsuits resulting from MLS policies it could not avoid because rules like BridgeMLS's foreclosed the option for Compass' agents to publicly market a home without giving it to the MLS, thus forcing them to follow MLS policies. Although the settlements were the result of MLS rules, BridgeMLS paid nothing. BridgeMLS forces Compass and its agents to give their valuable home listing data to BridgeMLS, which BridgeMLS then sells and licenses to third parties—including, through the REdistribute data-licensing venture, lenders, insurers, and other institutional data buyers—and distributes to real estate portals and other companies that earn hundreds of millions of dollars displaying Compass listings, while paying Compass nothing.[8] Because Compass is subject to BridgeMLS's rules, Compass has lost commissions on listings and agents it could not win without the ability to offer See It First™ on Compass, as well as ancillary revenue (such as mortgage, title, and escrow). All of these harms, and any others caused by BridgeMLS's illegal rules, must be paid back in triplicate, and the illegal rules must be enjoined.

## NATURE OF THE CASE

9. This lawsuit challenges the unlawful conduct of an MLS. MLSs are not pro-consumer, pro-competitive institutions; they are combinations of competing brokers and agents that make rules governing competition among them.[9] As such, MLS rules have long been regarded warily by courts and antitrust enforcers. When a group of competitors like an MLS "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[10] As the FTC

---

[8]BridgeMLS Rules 11.4, 11.6, 12.20; *BridgeMLS FAQ's*, BridgeMLS, https://bridgemls.com/mls-faq (identifying Zillow, Trulia, Redfin, realtor.com, and ListHub as recipients of listing feeds); About, REdistribute, https://redistribute.com/about (listing "BridgeMLS" among REdistribute's "MLS Licensors") ("REdistribute About Page"); REdistribute, Cal. Reg'l Multiple Listing Serv., https://go.crmls.org/redistribute/ ("CRMLS REdistribute Page").

[9]Except where applicable law or regulations would require otherwise, the terms "agent" and "broker" are used interchangeably throughout this complaint.

[10]*United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980).

noted in its seminal report on U.S. residential real estate, the people who control the MLS "control . . . the most important aspects of brokerage practices."[11] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

10. In the 1940s, the U.S. Department of Justice ("DOJ") brought civil and criminal charges against MLSs that fixed commission rates.[12] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[13] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[14]

11. BridgeMLS is a regional MLS serving the East Bay, with more than 3,500 subscribing brokers and agents,[15] covering principally Alameda and Contra Costa Counties and, under its own rules, a service area that spans twenty-three California counties.[16] BridgeMLS is governed by a Board of Directors composed of practicing real estate brokers and agents.[17]

12. For decades, BridgeMLS has been an unavoidable feature of residential real estate brokerage in the East Bay. Participation in BridgeMLS—or in one of the two other REALTOR® association MLSs with which BridgeMLS shares a single listing platform covering Alameda and

---

[11] Butters Report at 15.

[12] *See United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485, 487 (1950).

[13] *Realcomp II, Ltd. v. FTC*, 635 F.3d 815, 819 (6th Cir. 2011).

[14] *United States v. Consol. Multiple Listing Serv., Inc.*, No. 3:08-cv-01786-SB, 2009 WL 3150388, at *2 (D.S.C. Aug. 27, 2009).

[15] S.D.N.Y. Am. Compl. ¶ 33.

[16] BridgeMLS Rules 7.7.1.

[17] *Board of Directors*, BridgeMLS, https://bridgemls.com/board-of-directors.

Contra Costa Counties—is essential for any real estate agent to work in the East Bay; real estate agents cannot effectively represent clients in those areas without being members of an MLS subject to BridgeMLS's, or materially identical, rules.[18] While many homeowners are well served by pre-MLS or off-MLS marketing strategies, the importance of the MLS means it is still essential for agents to belong to the MLS in the area where they work. Thus, agents cannot survive in business without participating in the MLS.

13. Showing BridgeMLS's market power, agents must follow BridgeMLS's rules or BridgeMLS will fine and punish them, potentially by suspending or expelling them from BridgeMLS. BridgeMLS polices its members through a compliance function that monitors how its members (who are competitors) represent their clients. BridgeMLS encourages competing agents to report to BridgeMLS any rule violations by their competitors for punishment—and promises the reporting competitor that "your name will not be disclosed."[19] While the MLS is one of the rare private companies that fines and punishes its own customers, agents accept this because BridgeMLS membership is critical to their business and because it blunts competition they might otherwise face without the MLS rules.

14. The Anticompetitive Rules specifically block competition among brokers and agents, and homeowner choice. Rule 7.5 forces homeowners, brokers, and agents to give BridgeMLS their listings and forces them into all of BridgeMLS's restrictions: it requires a Broker Participant to input into BridgeMLS any exclusive right to sell or seller reserved listing of one-to-four-unit residential property or vacant land in BridgeMLS's service area within one business day after the property is first marketed or advertised to the public, or within two days after the seller signs the listing agreement or the listing begins, whichever is later.[20] Rule 7.5.1, BridgeMLS's version of

---

[18] *See* Bay East Ass'n of REALTORS®, MLS Rules and Regulations Rules 6.1, 10.1.1, 12.16(q)(i) (eff. Oct. 26, 2026); Contra Costa Ass'n of REALTORS®, MLS Rules and Regulations Rules 6.1, 12.16(q)(i) (amended eff. July 6, 2026) (requiring IDX displays to attribute listing data jointly to CCAR, Bay East, and BridgeMLS).

[19] *Report of Alleged MLS Rules Violation or Inaccurate Information*, BridgeMLS, https://app.salecore.com/public/getfile.ashx?bid=810530&id=38886&pin=5883.

[20] BridgeMLS Rules 7.5.

the National Association of REALTORS® Clear Cooperation Policy, separately requires the listing broker to submit a listing to BridgeMLS within one business day of marketing it to the public.[21] Unless they give the listing to BridgeMLS within one business day, homeowners and agents may not market or advertise the property through any of the channels BridgeMLS defines as public marketing, including signs, websites, social media, brokerage or franchise websites, email and text campaigns, multi-brokerage listing sharing networks, flyers, applications, or open houses.[22] Even though BridgeMLS does not own the home or represent the homeowner, BridgeMLS is dictating how the homeowner and their agent must sell the home.

15. The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS and marketed how BridgeMLS directs. Through these rules, BridgeMLS and its co-conspirators control how homeowners and agents market properties both on and off BridgeMLS. BridgeMLS and its co-conspirators, thus, control home marketing across the entire real estate industry in the East Bay.

16. These rules stand directly in the way of competition. Compass has invested hundreds of millions of dollars in developing technology, competition with other brokerages for agents and clients, and innovative marketing strategies. If a homeowner chooses phased marketing, it proceeds in three phases. In the first phase, the homeowner chooses to publicly market the property via channels outside of the MLS, such as select internet websites, social media, newsletters, yard signs, word of mouth, or other techniques. Homebuyers do not need to work with a Compass agent to view these listings, and agents at other brokerages can view these listings on request. In the second phase, the listing is displayed on the Compass and Redfin websites as a "Coming Soon," and other agents can learn about the property from the MLS. In the third phase, the listing is published by the MLS to tens of thousands of websites and other data recipients.

17. The phased marketing strategy has several advantages for homeowners. MLSs append to the listing (which is the homeowner's sales pitch to buyers) the history of price changes and days

---

[21]BridgeMLS Rules 7.5.1 ("Within one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants.").

[22]BridgeMLS Rules 7.5.

on market, which are perceived by buyers as signaling homeowner desperation. Having price changes and days on market in the homeowner's own advertisement often prevents homeowners from obtaining the full value of their property. This is unique to residential real estate: sellers of other goods are not forced to include, in their advertisements, price changes or how long the good has been for sale. By testing an aspirational price in a pre-MLS phase, homeowners may avoid the harms of unnecessary price cuts or days on the market being added by the MLS to the listing. Phased marketing also offers the chance to sell a house without the inconvenience and loss of choice that comes with listing it for sale through the MLS. In sum, phased marketing is good for some homeowners, good for agents seeking to represent those homeowners, and good for Compass. It does, however, threaten incumbents (who make up and control BridgeMLS) by forcing them to compete with Compass for homeowner clients, and to compete with Compass for agents who want a brokerage with innovative marketing strategies and choices they can offer to their clients.

18. BridgeMLS's rules offer a "Coming Soon" option, but it does not give homeowners the benefits of phased marketing. For example, Phase One is blocked outright by the Anticompetitive Rules: a homeowner may not publicly market a home at all unless the listing is first submitted to BridgeMLS.[23] Moreover, a homeowner may use Coming Soon status only after filing the listing with BridgeMLS, where it is viewable to all MLS Participants.[24] The homeowner therefore cannot test the market through limited public exposure before deciding whether, when, and how to release the listing through the MLS. In addition, once the listing is filed, any change to its asking price is recorded in the listing's MLS property history, which every participant can see, and the data remain in BridgeMLS's database.[25] BridgeMLS's other alternative to submission, an "office exclusive"

---

[23]BridgeMLS Rules 7.5, 7.5.1, 7.6.1.

[24]BridgeMLS Rules 10.1, 10.1.1(c), (k).

[25]*See MLS Compliance Documents*, BridgeMLS, https://bridgemls.com/compliance-documents; BridgeMLS Rules 11.8.

under Rule 7.6.1, is no alternative at all. It allows a homeowner to keep an exclusive listing out of BridgeMLS only if the homeowner directs that the property not be publicly marketed at all.[26]

19. The Anticompetitive Rules unreasonably restrain trade in two ways. BridgeMLS's agent members compete directly with one another and with Compass' agents for homeowners, and the Anticompetitive Rules block competition from brokers and agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC observed, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[27] Moreover, BridgeMLS is blocking competition between competing brokerages (the firms with which agents affiliate) to attract agents with innovative marketing strategies to win more clients.

20. A long history of antitrust enforcement shows why the Anticompetitive Rules violate the law. As recognized by the FTC, to comply with the antitrust laws, an MLS must give real estate brokers, agents, and homeowners true alternatives to the MLS—alternatives that existed in California for over 50 years.[28] For example, the "Fourteen Points" antitrust policy adopted in 1971 by the National Association of REALTORS® ("NAR"), which governs BridgeMLS,[29] expressly provides that an "MLS shall not: *Make any rule regulating the advertising or promotion of any listing*,"[30] and preserves an alternative to the MLS, which it calls an "office exclusive."[31] Before the Anticompetitive Rules, BridgeMLS's rules allowed a homeowner who did not want a listing

---

[26]BridgeMLS Rules 7.6.1 (defining "office exclusive" as a "listing where the seller has directed the listing broker to not publicly market their property and to not disseminate it through the MLS to other MLS Participants and Subscribers").

[27]Butters Report at 130.

[28]*Id.* at 129–30.

[29]BridgeMLS Rules 18 (NAR-mandated rule changes are incorporated automatically).

[30]Butters Report at 134 n.354 (emphasis added).

[31]*Id.* ("MLS shall not: Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office exclusive.'").

disseminated through the MLS simply to sign a certification excluding it and imposed no restriction on how an excluded listing could be publicly marketed.[32]

21. The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings [like BridgeMLS Rules 7.5 and 7.5.1]. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[33] The Anticompetitive Rules violate the Fourteen Points antitrust policy and cause the exact competitive injury about which the FTC warned. The DOJ commented on a policy similar to BridgeMLS's Rule 7.5.1 that the "[p]olicy restrict[ed] home-seller choices and preclude[d] competition from new listing services."[34] The DOJ's comment echoed the FTC's 1983 conclusion that "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[35]

22. In short, under federal and state law, brokers and agents are entitled to offer, and consumers are entitled to choose from, more than the limited options that the actions of BridgeMLS's combination of competitors have forced upon the industry. But BridgeMLS blocks that choice and the competition that choice would bring.

23. BridgeMLS and its co-conspirators have harmed brokers and agents including Compass, its agents, and homeowners. Compass is blocked from winning clients, from attracting agents, and from receiving the commissions and other benefits that would come from its competition through innovative marketing strategies. Homeowners are hurt because they (1) cannot sell their own properties however they legally want, including in ways that test the market, and manage the sales process; (2) cannot benefit from marketing strategies that, on average, provide them with a 4.6%

---

[32] MLS Rules and Regulations, Rules 7.5, 7.6, East Bay Regional Data, Inc. (2016), https://ebrdrules.readthedocs.io/en/latest/Section7.html.

[33] Butters Report at 130.

[34] *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations).

[35] Butters Report at 130.

higher sale price, 34% fewer days on the MLS, and 29% fewer price cuts; and (3) cannot benefit from the fiduciary duty agents owe to their clients of "utmost care, integrity, honesty, and loyalty."[36]

24. BridgeMLS has no valid justifications for its illegal conduct. Any claim BridgeMLS makes is undermined by recent history: on information and belief, until May 2020, BridgeMLS allowed agents and their clients to market pre- and off-MLS without fines, and homes were legally sold throughout the East Bay. Moreover, MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed, and homes are still sold legally. BridgeMLS's restraints on competition are not about "transparency." BridgeMLS does not allow homeowners or homebuyers to become members or to directly search or access its MLS database.[37] Nor does it accept for-sale-by-owner listings.[38] BridgeMLS's own rules allow listings to be hidden, just as long as they are not publicly marketed outside of BridgeMLS.[39] Its restraints also have nothing to do with "free-riding." The free-riding justification was rejected by a federal appellate court in nearly identical circumstances.[40] Compass also gets nothing for free. Compass agents pay BridgeMLS dues and contribute their listings to BridgeMLS. Even when homeowners publicly market their properties pre-MLS, most would still instruct Compass to give their listings to the MLS before they sell (over 93% of all Compass listings, including listings publicly marketed pre- and off-MLS, are sold after being submitted to the local MLS). On the other hand, BridgeMLS gives listings to third-party portals and other companies that do not contribute any listings.

25. Compass hereby brings claims against BridgeMLS for: (1) violating the Sherman Act, 15 U.S.C. § 1; and (2) violating the Cartwright Act, Cal. Bus. & Prof. Code § 16720 et seq.

---

[36] Cal. Civ. Code § 2079.16.

[37] *BridgeMLS FAQ's, supra (BridgeMLS* "is open to Real Estate Brokers, Agents, and Appraisers who are licensed . . . and Clerical staff who work for a licensed broker").

[38] BridgeMLS Rules 4.1.1, 4.2.1, 7.21, 8.1–8.2 (providing that BridgeMLS accepts only the listings of its broker Participants and Subscribers under a written listing agreement).

[39] *See* BridgeMLS Rules 7.6.1 (an office exclusive is available only where the seller has directed the listing broker not to publicly market the property and not to disseminate it through the MLS).

[40] *Realcomp II, Ltd.*, 635 F.3d at 835.

**PARTIES**

26. Plaintiff Compass, Inc. is a Delaware corporation with its principal place of business in New York, New York. Compass is an innovative, national real estate technology company and brokerage that provides a proprietary, end-to-end cloud-based platform for agents and their clients. Under the brand names "@properties," "Ansley Real Estate," "Better Homes & Gardens Real Estate," "Century 21," "Christie's International Real Estate," "Coldwell Banker," "Compass," "Corcoran," "ERA," "Latter & Blum," "Sotheby's International Realty," and "Washington Fine Properties," Compass operates brokerages and licenses franchises throughout the United States, including California. Compass empowers thousands of agents with cutting-edge technology to better serve homebuyers and homeowners. Compass also has title & escrow and mortgage joint-venture operations across the United States, including California.

27. Plaintiff Compass California II, Inc. is a Delaware corporation that is licensed by the California Department of Real Estate as a corporate real estate broker and that operates as a real estate brokerage in California, including through branch offices in Oakland, Berkeley, Alameda, Fremont, Livermore, and Pleasanton, in Alameda County, and in Walnut Creek, Danville, Lafayette, and Hercules, in Contra Costa County. Its main office is located at 891 Beach Street, San Francisco, California.[41] Compass California II, Inc. is a wholly-owned indirect subsidiary of Compass, Inc.

28. Compass California II, Inc. ("Compass California II") is a participant in BridgeMLS, is the party to the listing agreements with Compass' homeowner clients in the BridgeMLS service area, and is the entity against which BridgeMLS enforces its rules.

29. Defendant BridgeMLS, Inc. is a California stock corporation with its principal place of business at 2855 Telegraph Avenue, Suite 600, Berkeley, California 94705, in Alameda County. BridgeMLS, formerly known as East Bay Regional Data, Inc., is wholly owned by the Bridge

---

[41] Public License Lookup, License ID 01527235 (Compass California II, Inc.), Cal. Dep't of Real Estate, https://www2.dre.ca.gov/PublicASP/pplinfo.asp?License_id=01527235.

Association of REALTORS®.[42] BridgeMLS has more than 3,500 subscribers, and brokers and agents of other Northern California MLSs have access to BridgeMLS listings through data-share and cross-pollination agreements.[43] BridgeMLS's Board of Directors is made up of practicing real estate brokers and agents.

30. BridgeMLS is a contract, combination, or conspiracy of competing agents and brokers. BridgeMLS's participating brokers and agents compete directly with one another and with Plaintiffs for homeowner clients, homebuyer clients, and agents. Those brokers and agents have each agreed in writing to abide by BridgeMLS's rules; they follow and enforce those rules; and they govern BridgeMLS through its Board of Directors and MLS Committee.[44]

31. BridgeMLS Rule 7.7 provides that BridgeMLS's service area is determined by BridgeMLS and its MLS Committee, subject to approval by its Board of Directors, and Rule 7.7.1 defines that service area to include twenty-three California counties, from Alameda and Contra Costa to Sacramento, San Francisco, Santa Clara, and Tuolumne.[45] BridgeMLS's core service area is Alameda and Contra Costa Counties, where it shares a single listing platform with the MLSs operated by two other REALTOR® associations: the Bay East Association of REALTORS® ("Bay East") and the Contra Costa Association of REALTORS® ("CCAR").

**BRIDGEMLS'S CO-CONSPIRATORS**

32. Competing agents, including those enforcing BridgeMLS's rules, conspired with each other and BridgeMLS to design, approve, enforce, and implement the Anticompetitive Rules. BridgeMLS has also coordinated with other MLSs to defend and maintain rules similar to the Anticompetitive Rules, including by joining six other MLSs in a single lawsuit against Compass

---

[42] *East Bay Regional Data Announces Rebranding and Changes Name to BridgeMLS*, PR Newswire (Apr. 25, 2017), https://www.prnewswire.com/news-releases/east-bay-regional-data-announces-rebranding-and-changes-name-to-bridgemls-300445371.html; Rule 7.1 Statement, Ariz. Reg'l Multiple Listing Serv., ECF No. 9.

[43] S.D.N.Y. Am. Compl. ¶ 33; BridgeMLS Rules 6.1.

[44] BridgeMLS Rules 3, 4.1.1(d), 4.11.

[45] BridgeMLS Rules 7.7, 7.7.1. *But see* S.D.N.Y. Am. Compl. ¶ 33 (describing BridgeMLS's service area as Alameda, Contra Costa, and Tuolumne Counties).

seeking a declaration that those rules are lawful and an injunction barring Compass from challenging them.[46]

33. Bay East and CCAR also participated in the combination. Each is a REALTOR® association that operates an MLS whose participants and subscribers are real estate brokers and agents who compete with Compass and with BridgeMLS's participants. BridgeMLS, Bay East, and CCAR, whose REALTOR® associations serve different parts of Alameda and Contra Costa Counties, operate their MLSs as a combined system: under their cross-pollination and data-share agreements, a listing submitted to any one of them is displayed in the MLS systems of all three, and listing data displayed by participants of any of them is attributed jointly to all three.[47] Through the NorCal MLS Alliance, launched on January 20, 2021, BridgeMLS, Bay East, CCAR, and four other Northern California MLSs integrated their listing data so that a listing entered once on the shared platform is distributed to each participating MLS. The Alliance MLSs' rules committees also developed a set of "Common MLS Rules," including a uniform deadline for submitting listings to the MLS and a uniform deadline for submitting the form a seller must sign to keep a listing off the MLS.[48] They also jointly set MLS policy through an MLS Management Group made up of representatives of all three, which has adopted MLS rules and Paragon system changes that apply across all three MLSs.[49] Bay East and CCAR have adopted, and enforce against their

---

[46]S.D.N.Y. Am. Compl. ¶ 8 & Prayer for Relief ¶¶ A, C, F.

[47]BridgeMLS Rules 6.1; Contra Costa Ass'n of REALTORS®, MLS Rules and Regulations Rule 6.1 (amended eff. July 6, 2026); Bay East Ass'n of REALTORS®, MLS Rules and Regulations Rule 6.1 (eff. Oct. 26, 2026); NorCal MLS Alliance, Contra Costa Ass'n of REALTORS®, https://ccartoday.com/mls-resources-information/norcal-mls-alliance/ ("Alliance Page") (explaining that members "input [their] listings into one database (Paragon) for automatic syndication to all four participating MLSs").

[48]Alliance Page; Common MLS Rules items 1–2, NorCal MLS Alliance, https://assets-ccartoday.s3.us-west-1.amazonaws.com/_pdfs/mls/norcal_alliance_common_rules.pdf (linked from Alliance Page).

[49]Bay East Ass'n of REALTORS®, Bylaws art. XVII, §§ 1(a), 2, at 37 (rev. May 28, 2025) (providing that the Bay East MLS is "operated under the supervision of the Bay East MLS / Contra Costa MLS / bridgeMLS combined Multiple Listing Service Group (MMG)"); Committees, Bay East Ass'n of REALTORS®, https://bayeast.org/committees/ (describing the MLS Management Group as "a joint group between Bay East, BridgeMLS, and Contra Costa Association of REALTORS®"); April 2022 Archives, Bay East Ass'n of REALTORS®, https://bayeast.org/2022/04 (reporting that the MLS Management Group, "consisting of

participants and subscribers, rules materially identical to the Anticompetitive Rules, including materially identical one-business-day mandatory-submission requirements and definitions of public marketing, and they offer a materially identical, and equally inadequate, office-exclusive option, which forbids any public marketing of an office exclusive listing.[50] And through their cross-pollination and data-share agreements, BridgeMLS, Bay East, and CCAR have agreed that submission of a listing to any one of them satisfies the mandatory-submission requirement of the others, so that an agent cannot escape the Anticompetitive Rules by joining Bay East or CCAR instead of BridgeMLS.[51]

34. By adopting and enforcing materially identical rules on a shared platform, BridgeMLS, Bay East, and CCAR have agreed to impose, and do impose, the same restraint on public marketing throughout Alameda and Contra Costa Counties. Together, the three MLSs serve thousands of brokers and agents who list and sell homes in those counties.[52]

35. BridgeMLS's co-conspirators performed acts and made statements in furtherance of BridgeMLS's anticompetitive conduct. BridgeMLS is jointly and severally liable for the acts of its co-conspirators, whether or not they are named as defendants in this complaint.

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

36. **Jurisdiction.** This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Compass brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from BridgeMLS's and unnamed co-conspirators' violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

---

representatives from Bay East, Contra Costa, and bridge MLS," adopted new MLS Rule 12.6.1 and Paragon system changes effective May 24, 2022).

[50]Bay East Ass'n of REALTORS®, MLS Rules and Regulations Rules 7.5, 7.5.1, 7.6.1, 7.7 (eff. Oct. 26, 2026); Contra Costa Ass'n of REALTORS®, MLS Rules and Regulations Rules 7.5, 7.5(a), 7.6.1, 7.7 (amended eff. July 6, 2026).

[51]BridgeMLS Rules 6.1, 7.7.

[52]S.D.N.Y. Am. Compl. ¶ 33; Bay East Association of REALTORS® Install 2026 Leadership Team, Bay East Ass'n of REALTORS® (Feb. 7, 2026), https://bayeast.org/wp-content/uploads/02-07-2026-Bay-East-Install-2025-Leadership-Team.pdf; Alliance Page ("Each MLS has thousands of agents using their system.").

37. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 and has supplemental jurisdiction over Compass' state-law claim under 28 U.S.C. § 1367(a) because that claim arises from the same nucleus of operative fact as the federal claims.

38. This Court has personal jurisdiction over BridgeMLS because it is a California corporation whose headquarters and principal place of business are in Berkeley, California, in this District, and BridgeMLS conducts substantial business in this District.

39. **Venue.** Venue is appropriate in this District because BridgeMLS's headquarters and principal place of business are in this District and because a substantial portion of the transactions and events giving rise to this action—the agreement among the competing brokerages and the actual and threatened enforcement of anticompetitive rules—occurred in this District. 28 U.S.C. § 1391(b)(1)–(2); 15 U.S.C. § 22.

40. **Divisional Assignment**. This action arises in Alameda County, where BridgeMLS is headquartered and where a substantial part of the events or omissions giving rise to the claims occurred, including the adoption and enforcement of the Anticompetitive Rules. Under Civil Local Rule 3-2(c)–(d), this action is properly assigned to the San Francisco Division or the Oakland Division. Plaintiffs respectfully submit that the Oakland Division is appropriate.

## TRADE AND COMMERCE

41. BridgeMLS has entered into agreements with each of its thousands of subscribers and facilitates the sale of thousands of residential homes and condominiums each year. These transactions, together with the associated mortgage financing, out-of-state buyers and homeowners, and national title insurance, are in and have a substantial effect on interstate commerce, as used in 15 U.S.C. § 1.

## RELEVANT MARKETS

42. **Relevant Product Markets.** There are at least three relevant product markets: (1) provision of real estate brokerage services to homeowners (the "Brokerage Services Market"); (2) provision of real estate brokerage services to agents who represent homeowners (the "Agent Services Market"); and (3) provision of multiple listing services to brokers and agents who represent homeowners (the "MLS Market") (collectively, the "Relevant Markets").

a. The Brokerage Services Market includes the services that brokerages and agents provide their homeowner clients. Those services include, among other things, advising on pricing and marketing, conducting marketing activities, and negotiating with buyers. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of brokerage services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages and agents who participate in and control BridgeMLS compete in the Brokerage Services Market.

b. The Agent Services Market consists of services that brokerages provide to agents. Those services include, among other things, sharing commissions with the agent, developing and maintaining a strong brand that appeals to consumers, investing in and providing technology agents can use in representing clients, and supporting agents in representing their clients, including by offering innovative and appealing ways to better serve their clients. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of agent services likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms. Compass and the brokerages who participate in and control BridgeMLS compete in the Agent Services Market.

c. The MLS Market consists of the services that MLSs provide to brokers and agents. Those services include a repository of property listings, distribution of listings to other agents, and syndication of those listings through data sharing feeds to other participants, including the other real estate brokers and agents in the area and the large public-facing aggregator websites such as third-party portals. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of multiple listing services likely would undertake at least a small but significant and non-transitory

increase in price or other worsening of terms. BridgeMLS participates in the MLS Market.

43. **Relevant Geographic Market.** The relevant geographic market for each of the defined product markets is no larger than BridgeMLS's core service area, Alameda and Contra Costa Counties. A hypothetical profit-maximizing firm, not prevented by regulation from increasing prices or worsening terms, that was the only present and future seller of each of the relevant products in this geographic market likely would undertake at least a small but significant and non-transitory increase in price or other worsening of terms.

44. Brokers and agents cannot avoid the Anticompetitive Rules by using a neighboring MLS or an MLS with a data sharing agreement with BridgeMLS for several reasons:

a. Brokers and agents need to be members of the MLS that covers their region because being an "out-of-region" broker or agent makes it harder to attract clients and agents.

b. BridgeMLS's rules bind its members to the rules of the MLSs with which it shares data. Under BridgeMLS Rule 6.1, BridgeMLS participates in a regional "Cross Pollination Agreement" with MetroList®, the San Francisco Association of REALTORS® MLS, Bay East, CCAR, BAREIS MLS, MLSListings®, CLAW, and CRMLS, under which each organization's listings are displayed in the others' systems. By submitting a listing, BridgeMLS members agree to cooperate with the members of those organizations, and members who enter a listing into MetroList®'s service area agree to be bound by MetroList®'s rules.[53]

c. BridgeMLS Rule 7.7 further provides that, where BridgeMLS has entered into regional MLS, data share, or cross-pollination agreements, submission of covered listings is mandatory for the combined service areas of the participating associations, and that submission to a cross-pollination partner MLS satisfies the

[53] BridgeMLS Rules 6.1.

requirement.[54] An agent therefore cannot escape BridgeMLS's mandatory-submission and public-marketing requirements by moving to a partner MLS: the listing still must be submitted to an MLS within one business day of any public marketing, and Bay East and CCAR, the two MLSs with which BridgeMLS shares its listing platform in Alameda and Contra Costa Counties, enforce materially identical rules.[55]

d. BridgeMLS's rules apply to all agents and listings affiliated with a "Listing Broker," which means that every listing by an agent affiliated with a brokerage is subject to the Anticompetitive Rules, even if the homeowner does not want it in BridgeMLS. Under BridgeMLS Rule 4.6, whenever the rules refer to the *Listing Broker*, the term includes "the real estate Subscriber or a licensee retained by the Listing Broker," without "reliev[ing] the Listing Broker of responsibility for the act or rule specified."[56] Each Participant must give BridgeMLS a list of every licensee affiliated with the Participant's firm, and BridgeMLS assesses its recurring access fees on all of those licensees unless the Participant certifies in writing that a licensee will not use the MLS.[57] And a Participant may be disciplined for a violation by any salesperson affiliated with it; the Participant's lack of knowledge of the violation "shall only go to mitigation of discipline imposed."[58] Thus, if one agent in a brokerage needs BridgeMLS access, all agents in that brokerage are bound by BridgeMLS's rules.

45. To serve their clients and compete in the BridgeMLS service area, brokers and agents must have access to BridgeMLS, or to an MLS bound by its rules, and must follow those rules. Thus, in

---

[54] BridgeMLS Rules 7.7.

[55] Bay East Ass'n of REALTORS®, MLS Rules and Regulations Rules 7.5, 7.5.1, 7.6.1, 7.7 (eff. Oct. 26, 2026); Contra Costa Ass'n of REALTORS®, MLS Rules and Regulations Rules 7.5, 7.5(a), 7.6.1, 7.7 (amended eff. July 6, 2026).

[56] BridgeMLS Rules 4.6.

[57] BridgeMLS Rules 4.4, 5.1.4, 5.1.5.

[58] BridgeMLS Rules 14.1(c).

both the Brokerage Services Market and the Agent Services Market, the brokers and agents that combine to adopt, follow, and enforce the Anticompetitive Rules collectively have market power. In the MLS Market, BridgeMLS—alone and together with Bay East and CCAR, the MLSs with which it shares its listing platform and which enforce materially identical rules—has market power.

46. As the DOJ has alleged, "By virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing brokers) has market power in almost every relevant market."[59] And, as the DOJ and FTC reported, "[a]s the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS."[60]

## FACTUAL ALLEGATIONS

### MLSs and the Antitrust Laws

47. An MLS aggregates listings submitted by participating agents into a common database and makes the resulting data available to MLS participants and subscribers. BridgeMLS describes its MLS as "a means by which cooperation among participants is enhanced" and "a facility for the orderly correlation and dissemination of listing information so participants may better serve their clients and the public."[61] In operating its MLS, BridgeMLS collects listing information from its Broker Participants and Subscribers, who must input their listings and report their sales, and who license BridgeMLS to include that information in its copyrighted MLS compilation.[62]

---

[59] Am. Compl. ¶ 24, *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140 (N.D. Ill. Oct. 4, 2005), *reprinted in* 73 Fed. Reg. 36,104, 36,105 (June 25, 2008).

[60] DOJ & FTC, *Competition in the Real Estate Brokerage Industry* 12 (Apr. 2007) ("2007 DOJ/FTC Report"), *available at* https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf.

[61] BridgeMLS Rules 2.

[62] BridgeMLS Rules 7.5, 10.2, 11.4.

48. MLSs also make and enforce rules. BridgeMLS explains how competing agents can help enforce BridgeMLS's rules: it publishes a form for reporting alleged rule violations, promises reporting agents that their names will not be disclosed, and directs Clear Cooperation questions to a dedicated compliance email address.[63]

49. In addition to operating its members-only database, BridgeMLS distributes agent and homeowner data to third parties, such as real estate web portals,[64] which monetize it in various ways, e.g., selling leads for potential buyers to agents by displaying the data on websites with advertising alongside. BridgeMLS also sells the listing data its participants are required to submit: it participates as a licensor in REdistribute, a venture founded by two other MLSs that sells MLS listing data to lenders, insurers, and other institutional buyers and shares the resulting revenue with the participating MLSs.[65] On information and belief, BridgeMLS also earns revenue from those data in other ways, including by charging fees to vendors that receive its listing data feeds, and supplies those data to companies that build tools that brokerages use to recruit agents from competing brokerages.

50. Brokerages that have adopted the traditional, mutually aligned business model of real estate sales rely passively on one another to provide their listings to each other via the MLS. MLSs that are composed of or governed by brokerages and agents with traditional business models have a strong financial incentive to impair the business models of innovators and mavericks who seek to offer marketing options to homeowners that eschew immediate and automatic sharing of their listings on the MLS regardless of the circumstances or preferences of the homeowner. Such MLSs,

---

[63] *Report of Alleged MLS Rules Violation or Inaccurate Information*, *supra*; *Clear Cooperation Policy*, BridgeMLS, https://app.salecore.com/public/getfile.ashx?bid=810530&id=38885&pin=717 (directing questions to compliance@bridgemls.com).

[64] BridgeMLS Rules 11.6, 12.16, 12.20; *BridgeMLS FAQ's*, *supra*.

[65] REdistribute About Page (identifying CRMLS and Bright MLS as REdistribute's founders and listing BridgeMLS among its "MLS Licensors"); CRMLS REdistribute Page (describing REdistribute as a joint venture founded by CRMLS and Bright MLS that distributes MLS data to institutional users in fields "such as insurance, mortgage lending, etc.," and stating that "the revenue generated from data use by licensees will be shared back with the brokers and MLS organizations that participate").

and the traditional brokerages and agents that control them, try to prevent their members from publicly marketing properties off-MLS, because publicly marketing off-MLS presents a competitive challenge to the traditional brokerages.

51. MLSs are private companies. Unlike agents, MLSs do not owe fiduciary duties to anyone, let alone consumers. They are not government entities or law enforcement agencies, even though they pretend to have similar powers when interacting with agents. MLSs are not inherently pro-consumer, pro-competitive institutions; they are organizations of competing agents that make rules governing competition among them. They enforce those rules by fining and punishing their members.

52. As such, MLSs and their rules have long been regarded warily by courts and antitrust enforcers. When competitors "join together to cooperate in the conduct of their business, there naturally arise antitrust suspicions."[66] As the FTC wrote, control over the MLSs gives "Realtor groups the single most powerful tool available for shaping brokerage practice."[67] That control has been used in the past to do things like fix commission rates, discriminate against discounters, discriminate against internet brokerages, and discriminate against minorities.

53. In the 1940s, the DOJ brought civil and criminal charges against MLSs that set commission rates.[68] Since then, there have been over 100 antitrust investigations and lawsuits challenging mandatory rules imposed by MLSs—many of which challenged rules controlling the public marketing of homes. For example, in a case brought by the FTC against an MLS, a federal court held that a policy limiting the public distribution and display of listings based on the nature of the listing contract "unreasonably restrained competition."[69] Another federal court ordered that an MLS "shall not adopt, maintain, or enforce any Rule . . . that directly or indirectly . . . prohibits, restricts, or impedes any truthful advertising or marketing activities of any home seller or

---

[66] *Realty Multi-List*, 629 F.2d at 1370.
[67] Butters Report at 92–93.
[68] *See Nat'l Ass'n of Real Est. Bds.*, 339 U.S. at 487.
[69] *Realcomp II, Ltd.*, 635 F.3d at 819.

discriminates against or disadvantages any Member or Licensee for any truthful advertising or marketing activity in which any home seller is engaged."[70]

54. Recognizing the pro-competitive benefits of pre-MLS marketing strategies is consistent with the federal antitrust agencies' long-standing views of the real estate markets. "[T]he Agencies have challenged . . . as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models."[71] For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-for-service brokers were not denied MLS access.[72]

55. This history is long-standing and specific. On behalf of all its affiliated MLSs, NAR addressed this antitrust problem in 1971. As the FTC described:

> By the late 1960's and early 1970's, MLSs had been named in a number of private antitrust actions and Justice Department investigations. Justice Department investigations culminated in 15 consent orders banning price fixing and other alleged anti-competitive activities. In response to these legal problems, the National Association of Realtors developed and enforced a list of policy points.[73]

56. NAR's November 15, 1971, statement, setting out and mandating these policies on the Realtor MLSs, is referred to in the industry as the "Fourteen Points" antitrust policy. Point 11 of the policy specifically addressed the antitrust problem caused by mandatory submission rules by guaranteeing an alternative method of selling residential properties to the MLS: the "office exclusive."[74] Specifically, the antitrust policy expressly provided that "MLS shall not: *Prohibit or discourage a member from accepting a listing from a seller (owner) preferring to give [an] 'office*

---

[70] *Consol. Multiple Listing Serv., Inc.*, 2009 WL 3150388, at *2.

[71] 2007 DOJ/FTC Report at 63; *see also Realty Multi-List*, 629 F.2d 1351; *Realcomp II, Ltd.*, 635 F.3d 815.

[72] 2007 DOJ/FTC Report at 64 (describing and citing cases).

[73] Butters Report at 109.

[74] *Id.* at 130.

*exclusive.*'"[75] Point 10 provided that "MLS shall not: *Make any rule regulating the advertising or promotion of any listing*."[76] The FTC found that the Fourteen Points antitrust policy "may have ameliorated any competitive injury which would otherwise have resulted from 'mandatory' submissions of listings. Where 'office exclusives' are allowed, that is, where the seller can specify that his or her listing not be placed on the MLS, the broker and seller appear to be free to contract as they see fit."[77] The term "office exclusive" just meant the listing was not provided to the MLS, and before the Anticompetitive Rules, a homeowner could market the home however she wanted. BridgeMLS's mandatory submission rules cannot possibly comply with the antitrust laws because agents and homeowners have no freedom to avoid BridgeMLS's restrictions or market their homes how they choose under the Anticompetitive Rules.

**The Anticompetitive Rules**

57. BridgeMLS's rules are adopted and administered by the practicing brokers and agents who serve on its Board of Directors and MLS Committee. Under BridgeMLS Rule 3, the MLS is governed by an MLS Committee in accordance with the bylaws of BridgeMLS's parent association and the rules and regulations adopted by BridgeMLS's Board of Directors, and all actions of the MLS Committee are subject to Board approval.[78] Under BridgeMLS Rule 18, rule changes mandated by NAR—including NAR's Clear Cooperation Policy, which Rule 7.5.1 implements—are incorporated automatically into BridgeMLS's rules without a vote of its Board.[79]

58. Rule 7.5 requires that, within one business day of marketing or advertising a property to the public, or within two days after the seller signs the listing agreement or the listing begins, whichever is later, the Broker Participant input any exclusive right to sell or seller reserved listing

---

[75] *Id.* at 134 n.354 (emphasis added).
[76] *Id.* (emphasis added).
[77] *Id.* at 130.
[78] BridgeMLS Rules 3.
[79] BridgeMLS Rules 18; *Clear Cooperation Policy*, BridgeMLS, https://app.salecore.com/public/getfile.ashx?bid=810530&id=38885&pin=717 (Clear Cooperation rule "Adopted 11/19"); 2020 CCAR Clear Cooperation Announcement (announcing a "May 1st implementation date" for the Clear Cooperation rule, coordinated with CCAR's "MLS partners (Bay East & bridgeMLS)").

of one-to-four-unit residential property or vacant land in the service area into BridgeMLS "for cooperation with other Participants." Rule 7.5 defines public marketing to include conveying or displaying any information about the property or its availability for sale through signs, public-facing websites, social media, brokerage or franchise websites (including IDX and VOW sites), email, text, phone, and social-media messaging campaigns, multi-brokerage or franchise listing sharing networks, flyers or written material, applications available to the public, or an open house.[80] Rule 7.5.1 separately requires submission within one business day of marketing a property to the public.[81] The effect of these rules is to prevent homeowners and their agents from publicly marketing homes for sale unless those homes are listed in the MLS.

59. If a BridgeMLS participant violates BridgeMLS's rules, BridgeMLS can punish the real estate agent and/or brokerage by levying fines or blocking their access to the listings database.[82] Under BridgeMLS's schedule of "Citable Infractions," a failure to submit a listing within one business day of public marketing is punishable by a warning letter for a first violation, a $500 fine for a second, and a $1,000 fine for a third.[83] BridgeMLS's rules also authorize additional sanctions after a hearing, as well as suspension and termination of MLS access for failure to pay fines.[84] BridgeMLS polices its rules, as do BridgeMLS's members.

**See It First™ on Compass**

60. A homeowner may decide to submit a property listing immediately to the MLS for distribution. Alternatively, a homeowner may decide to engage in one or more public marketing strategies that precede distribution through the MLS. These pre- and off-MLS strategies may take a number of different forms. Historically, "office exclusives" were a practice of publicly marketing a property off the MLS. Another alternative is a "Coming Soon" listing, where a listing is available

---

[80] BridgeMLS Rules 7.5, 7.5.1.

[81] BridgeMLS Rules 7.5.1.

[82] BridgeMLS Rules 7.17.2, 14.1–14.4, 17.1.

[83] Appendix A § 2.1.1; *see also id.* § 2.1 (warning letter, $100, and $200 for violations of Rule 7.5).

[84] BridgeMLS Rules 14.2–14.4, 17.1; Appendix A § 5.6.

to other participants in the MLS and may be posted to an agent's website or to other selected websites.

61. Compass is an innovative, technology-forward real estate brokerage. From its founding in 2012, Compass has invested in and developed pre- and off-MLS marketing strategies. These marketing strategies allow homeowners to choose effective options to meet their goals. Today, Compass refers to these strategies under its "See It First™ on Compass" umbrella; a prior version was called Compass' 3-Phased Marketing Strategy. Compass agents offer See It First™ on Compass to clients everywhere it is permitted, although BridgeMLS impedes that competition to protect its members, who are Compass' competition.

62. Compass agents always discuss the advantages and disadvantages of immediate MLS distribution and phased marketing with the homeowner. The homeowner decides what to do. When working with a Compass agent, a homeowner who opts to use See It First™ on Compass as a strategy signs disclosures[85] acknowledging that the listing will not initially appear in the active MLS feed.

63. In the first phase of See It First™ on Compass, agents do not list the property on the MLS but publicly market listings in every off-MLS way allowed by local MLS rules, including informing viewers on Compass' website that (unspecified) off-MLS listings exist in the area in which the user is searching. A prospective buyer need not hire a Compass agent, or any agent, to learn about or obtain access to these listings. A buyer may contact a Compass office directly, ask a non-Compass agent to contact Compass, or register on their own without charge. Agents at other brokerages also can view these listings on request.

64. In the second phase of See It First™ on Compass, the listing moves to a "Coming Soon" status. If the homeowner instructs the agent to do so, Compass advertises "Coming Soon" listings on its own website and also distributes them to Redfin.com, a third-party real estate site, which combined have over 50 million monthly active users. Coming Soon status signals to prospective

[85]These disclosures are available at https://www.compass-homeowners.com.

buyers that the property will soon become active on the MLS and allows the homeowner to gather valuable feedback about the property before that point.

65. Finally, after these first two phases, the property moves to the third phase and goes active on the MLS and is sent by the MLS to tens of thousands of internet websites and data vendors. The homeowner and agent benefit from the pre-MLS phases because they will have provided insight on pricing, staging, and marketing strategy. Some listings sell before reaching broad MLS distribution, but more than 93% continue to the third phase, listing on the MLS.

66. The listing is the homeowner's advertisement for the home. Like any seller of property, the homeowner is entitled to say whatever she wants in the listing to sell the home so long as the listing complies with the law. And, just like a seller of anything, a homeowner should not be forced to put things into their advertisement that hurt the homeowner unless required by the law. A homeowner should not be forced to tell a buyer all the ways that the buyer can negotiate against the homeowner. But the MLS forces the homeowner's advertisement—the listing—to contain things that are not required by the law and that no reasonable homeowner would want in their listing, including days on market and history of price changes.

67. The phased marketing strategy has several advantages for homeowners.

a. First, because MLSs put the history of price changes onto the listing, and price cuts are perceived by buyers as signaling desperation, homeowners often forgo asking a higher price at the outset to avoid the risk of having to cut the price and reduce their bargaining leverage relative to buyers. This can prevent homeowners from obtaining the full value of their properties. By testing an aspirational price in a pre-MLS phase, homeowners may obtain a higher price with less risk of a price cut later. A pre-MLS listing also avoids third-party aggregators applying their own flawed pricing algorithms to public listings, which could reduce the amount potential buyers might offer for the property.

b. Second, because off-MLS pre-marketing reduces the risk to homeowners of attempting to market their property before making costly upgrades, renovations,

cosmetic improvements, professional photographs, or other investments, off-MLS pre-marketing can save the homeowner the costs of making such investments.

c. Third, MLSs publish the number of days a listing has been on the MLS, and a higher number is likewise perceived by buyers as increasing their bargaining leverage relative to sellers. Pre-MLS marketing allows homeowners to test the market, build buyer interest, and refine their strategy without incurring days on the market.

d. Fourth, pre- and off-MLS marketing offers the chance to sell a house without the inconvenience that comes with publicly listing it for sale and offers the chance to assess whether expensive renovations are necessary to make the house more attractive to the broader market. Indeed, a homeowner may not yet be fully convinced that they want to sell the property or may want to avoid disruptive showings.

68. See It First™ on Compass offers homeowners the ability to market a property prior to full preparation, which may allow homeowners to reduce or avoid the costs, time, and risks associated with pre-sale improvements, while retaining the option to accept or decline early offers. Indeed, reported transactions are consistent with these benefits. For example, a homeowner experiencing a time of distress needed to sell her property quickly and was able to secure a buyer within a short period, without dimensions or even pictures through pre-marketing. Compass agents appreciate the ability to offer innovative strategies that help homeowners achieve their goals. At least nine agents in Northern California who recently joined Compass cited its inventory strategy and phased marketing as reasons for doing so.

69. This phased marketing strategy is good for homeowners, good for agents seeking to represent homeowners, and good for Compass. Compared with listings sent directly to an active MLS feed, properties marketed through Compass' phased marketing strategy sold for 4.6% more, had 34% fewer days on the MLS, and experienced 29% fewer price cuts. The phased marketing strategy does, however, threaten incumbent brokerages by forcing them to compete against Compass for homeowner clients and for agents who want to offer such innovative marketing strategies to their homeowner clients.

70. Homeowner demand for phased marketing has been substantial in the many areas of the country where MLSs allow Compass to offer it. By March 2025, approximately 48% of Compass homeowners selected phased marketing. After March 2025, the percentage of phased marketing listings fell due to Zillow's adoption of "Listing Access Standards" banning pre-marketed listings from Zillow and affiliated sites. The Listing Access Standards are similar to the Anticompetitive Rules in that they deny access to a public marketing platform, in that case Zillow's, based solely on the homeowner's decision to first market a property by other means. In a recent federal antitrust case, Zillow argued that its Listing Access Standards promoted competition by reducing pre-MLS marketing, but the court held both that Zillow failed to prove its claims and that the "record . . . identifie[d] plausible procompetitive effects from" strategies such as Compass' phased marketing strategy.[86]

71. Recognizing the benefits of pre- and off-MLS marketing for many homeowners, many MLSs do not penalize agents and homeowners for such marketing. MLSs serving more than 350,000 brokers and agents in at least 12 states allow homeowners to publicly market their properties, and those MLSs continue to succeed.

**Anticompetitive Effects**

72. The Anticompetitive Rules restrain trade in several ways.

a. First, because BridgeMLS's participating brokers and agents compete directly with one another and with Compass and its agents for homeowners and homebuyers, implementation and enforcement of the Anticompetitive Rules block competition from agents who want to offer innovative, pro-competitive, and pro-consumer public marketing options. As the FTC wrote, "On its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed."[87]

---

[86] *Zillow Grp., Inc. v. Midwest Real Est. Data LLC*, No. 1:26-cv-5451, 2026 WL 2720641, at *22 (N.D. Ill. Sept. 15, 2026), ECF No. 141.

[87] Butters Report at 130.

b. Second, BridgeMLS is blocking competition by other public marketing methods, identified by BridgeMLS Rule 7.5 as including signs, public-facing websites, social media, brokerage or franchise websites, digital communications marketing, multi-brokerage or franchise listing sharing networks, flyers, applications, and open houses—and most significantly the Compass website itself.[88]

c. Third, the Anticompetitive Rules also reduce competition among brokers, including Compass, by preventing them from competing through the timing, sequence, and scope of a listing's distribution.

d. Fourth, the Anticompetitive Rules further reduce competition among brokers, including Compass, by preventing them from competing to attract agents by offering them innovative, appealing ways to serve their homeowner clients.

**BridgeMLS's Justifications Are Pretextual**

73. BridgeMLS has no valid justification for its illegal conduct. On information and belief, BridgeMLS operated without such rules before May 2020, and many MLSs across the country allow homeowners to publicly market their properties however they want, and those MLSs still exist and succeed. These rules are not required for operating a successful MLS. These are not rules that ensure the integrity of the data distributed by BridgeMLS or prohibit its members from selectively editing or excluding the BridgeMLS listings they show their buyer clients. The Anticompetitive Rules govern marketing itself and require brokers and their clients to forgo profitable strategies on pain of being fined by or excluded from the MLS.

74. BridgeMLS's restraints on competition are not about "transparency." BridgeMLS does not allow homeowners or homebuyers to become members or to directly access its MLS database. BridgeMLS does not accept for-sale-by-owner listings. And BridgeMLS's own rules allow listings to be hidden, just as long as they are not publicly marketed.[89] BridgeMLS also lets a listing broker withhold listings from internet display on a blanket or listing-by-listing basis.[90] Nor are

---

[88]BridgeMLS Rules 7.5.

[89]*See* BridgeMLS Rules 7.6.1.

[90]BridgeMLS Rules 12.16(b), 12.16.3, 12.19.22.

BridgeMLS's restraints about equal access for buyers; any buyer, and any buyer's agent, can learn about, tour, and make an offer on a property marketed through See It First™ on Compass without hiring a Compass agent. Indeed, without See It First™ on Compass as an option, some homeowners would not choose to sell their property, ultimately reducing the inventory of homes on the market.

75. BridgeMLS's restraints also have nothing to do with "free-riding." In the lawsuit it filed against Compass in New York, BridgeMLS asserts that Compass "wants to have its cake and eat it too" because Compass "wants to continue to benefit from the listings that competing brokerages enter into the MLS, but . . . wants to unilaterally decide what information it puts into the MLS and when it puts that information into the MLS."[91] That is nonsense. In the first place, Compass does not seek special treatment. If Compass has its way, *every* member of BridgeMLS will be free to offer pre- and off-MLS marketing strategies to their clients.

76. Compass does not benefit from the contributions of other brokerages to the MLS without contributing to the benefits that other brokerages can obtain from the MLS. Compass contributes substantially to the benefits obtained by other brokerages and would continue to do so under the See It First™ on Compass program. Compass agents provide value to BridgeMLS and its members in critical ways, including by paying dues, exposing its buyer clients to listings submitted by other members and submitting listings to BridgeMLS for the benefit of all buyer agents in the BridgeMLS service area after the first two phases of the phased marketing strategy. This would happen for over 93% of all pre-marketed listings based on experience elsewhere.

77. In its New York complaint, BridgeMLS asserts other arguments about the purported drawbacks of pre- and off-MLS marketing[92] that amount to little more than paternalistically telling homeowners and their agents what is best for them. Competition requires innovation, and consumers will ultimately decide what innovations are worthwhile.

[91] S.D.N.Y. Am. Compl. ¶ 5.

[92] S.D.N.Y. Am. Compl. ¶¶ 76–84.

78. BridgeMLS's purported alternatives do not cure the restraint. BridgeMLS's "office exclusive" option under Rule 7.6.1 requires the seller to certify that the listing broker will do no public marketing or advertising of any kind—no yard sign, no website, no social media post, and no open house.[93] BridgeMLS's "Coming Soon" status requires the homeowner to give the listing to BridgeMLS for display to every participant before any public marketing begins.[94] And BridgeMLS's exemption for open listings[95] requires the homeowner and the agent to give up the exclusive representation that most homeowners want and that standard California listing forms provide.[96]

**Antitrust Injury to Compass, Its Agents, and Homeowners**

79. BridgeMLS's conduct causes significant, direct harm to Compass, its agents, and consumers. The harm resulting from this anticompetitive scheme encompasses the following:

a. *Lost Commissions and Financial Harm to Brokerage*: Compass has suffered direct financial harm through lost commissions due to Compass' inability to offer homeowners its phased marketing strategy, a superior product that attracts homeowners to Compass. Compass has also suffered direct financial harm through lost revenue from those homeowners through ancillary services, such as title and escrow services and mortgage services.

b. *Degradation of Compass Website*: The enforcement of the Anticompetitive Rules degrades Compass' proprietary technology platform by preventing Compass from posting pre-MLS listings in See It First™ on Compass, artificially suppressing web traffic and prospective leads.

---

[93]BridgeMLS Rules 7.6.1.

[94]BridgeMLS Rules 10.1.1.

[95]BridgeMLS Rules 7.5 (open listings are not required to be input).

[96]The DOJ views mandatory-listing policies, coupled with "exceptions benefitting primarily large brokerages," as anticompetitive. Supplemental Statement of Interest of the United States, *Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS, ECF No. 358, at 7 n.2 (D. Mass. Mar. 17, 2025). BridgeMLS's office-exclusive option under Rule 7.6.1 is precisely the sort of "exception" that confirms the anticompetitive character of the Anticompetitive Rules.

c. *Depressed Sales Prices and Lost Sales*: By eliminating Compass' ability to pre-market and test pricing, the Anticompetitive Rules force homeowners to launch blind on the MLS, frequently resulting in mispricing that depresses final home values, in lost sales, and in reduced commissions.

d. *Excessive Days on Market and Public Price Drops*: Forcing properties onto the MLS prematurely subjects them to the stigma of accumulating "days on market" and price reductions on the listing, which depress sale prices and related sales commissions.

e. *Lost Agents*: Compass is unable to compete for agents by offering them a phased marketing strategy that they can offer their clients. Moreover, on information and belief, BridgeMLS currently supplies Compass agent listing and agent transaction data to third-party software vendors, which package those data into products that brokerages buy and use to target and recruit Compass agents. The data that BridgeMLS forces Compass and its agents to give to the MLS should not be sold to a technology company that in turn further sells that data with its agent recruitment technology. An MLS powering competitor recruitment tools strays far beyond the core mission of an MLS—it weaponizes Compass' operational data against Compass for competitor poaching.

f. *Loss of Convenience and Harm to Innovation*: Homeowners are stripped of convenience surrounding their home sale, and consumers suffer from the commoditization of agent services and a reduction in pro-competitive choice.

80. Compass and its agents and homeowners have thus suffered antitrust injury as a result of the rules imposed by BridgeMLS and the agents and brokerages who control it. The Anticompetitive Rules harm competition because they foreclose homeowners and their agents from choosing a marketing strategy—limited, staged listing—that a substantial share of the market demands, thereby reducing product variety and consumer choice in the Relevant Markets. This restraint on competition directly causes Compass' injury: because Compass' phased marketing offering depends on the very marketing flexibility that the Anticompetitive Rules foreclose,

BridgeMLS's rules prevent Compass from offering phased marketing to homeowners and agents in the BridgeMLS service area, making Compass less competitive in the Brokerage Services Market and the Agent Services Market. The mechanism of harm to competition and the mechanism of harm to Compass are one and the same: BridgeMLS's rules prevent Compass from offering homeowners and agents innovative strategies they want.

81. Compass is therefore a proper party to bring this action. Compass' injury is direct, not derivative: it flows immediately from the Anticompetitive Rules and their enforcement against Compass agents and their homeowner clients. Compass' damages, including lost commissions, lost revenue from ancillary services, and diminished value of its technology platform, are neither speculative nor unduly complex to ascertain.

**BridgeMLS's Enforcement of the Anticompetitive Rules Against Compass**

82. BridgeMLS enforces the Anticompetitive Rules against Compass agents. On or about September 30, 2026, BridgeMLS issued Clear Cooperation warnings to two Compass California II agents concerning two listings in Oakland, in Alameda County, each directing that the listing be entered into BridgeMLS by the following day. Under BridgeMLS's schedule of citable infractions, a warning is the first step toward a $500 fine for a second violation and a $1,000 fine for a third, and toward the hearings, suspension, and termination of MLS access that BridgeMLS's rules authorize.[97]

83. BridgeMLS's enforcement has had its intended effect. For example, an Oakland homeowner gave a Compass agent written instructions to market the home first as a Compass Coming Soon before any MLS distribution. On or about September 30, 2026, BridgeMLS warned the agent under its Clear Cooperation rule and directed that the listing be entered into BridgeMLS by the next day. To avoid fines and further discipline, the agent did so, contrary to the homeowner's instruction, and she has since stopped offering phased marketing to her clients. In her words, BridgeMLS's warning was "short-lived but impactful."

[97] Appendix A § 2.1.1; BridgeMLS Rules 14.2–14.4, 17.1.

84. Because of the Anticompetitive Rules and the escalating sanctions BridgeMLS imposes for violating them, Compass agents in the BridgeMLS service area are deterred from offering See It First™ on Compass, and homeowners there who would choose phased marketing cannot obtain it. Compass therefore loses the listings, commissions, ancillary revenue, and agent recruits that See It First™ on Compass would otherwise attract.

85. On August 27, 2026, Compass wrote to BridgeMLS about its enforcement of the Anticompetitive Rules; BridgeMLS did not respond. On September 14, 2026, Compass formally demanded that BridgeMLS stop fining or punishing real estate professionals for publicly marketing office exclusive listings, and asked BridgeMLS to confirm in writing by October 6, 2026, that it would do so. Compass followed up on September 18, 2026. By agreement of counsel, the deadline was extended to October 30, 2026. BridgeMLS did not provide the requested confirmation. Instead, on October 21, 2026—nine days before the deadline—BridgeMLS and five other MLSs filed a declaratory judgment action against Compass in the Southern District of New York, across the country from the East Bay, seeking a declaration that their rules are lawful and an injunction barring Compass from suing them.[98] BridgeMLS filed that action in anticipation of this one, in an effort to deprive Compass of its choice of forum. BridgeMLS's rejection of Compass' demand confirms its and its co-conspirators' intent to continue enforcing the Anticompetitive Rules.

86. BridgeMLS's September 30, 2026, warnings to Compass California II agents were new and independent acts, not mere reaffirmations of prior acts: each required BridgeMLS to make a fresh, discretionary decision to apply the Anticompetitive Rules to a particular Compass listing—a decision BridgeMLS was free not to make—and each inflicted new injury on Compass. In addition, in 2025, following NAR's adoption of its "Multiple Listing Options for Sellers" policy, BridgeMLS amended Rule 7.5 to fold its one-business-day public-marketing trigger and an expanded definition of "public marketing" into its mandatory-submission rule, and adopted Rule 7.6.1's narrowed definition of "office exclusive," which forbids any public marketing of an office

[98] Compl., Ariz. Reg'l Multiple Listing Serv., ECF No. 1 (Oct. 21, 2026); S.D.N.Y. Am. Compl. ¶ 8 & Prayer for Relief ¶¶ A, C, F (adding MLSListings Inc. as a seventh plaintiff).

exclusive listing. And BridgeMLS refused Compass' demand and instead sued Compass on October 21, 2026. Compass seeks damages for injuries caused by acts within the applicable limitations periods, and its claims for injunctive relief are timely because BridgeMLS continues to enforce the Anticompetitive Rules today.

## CAUSES OF ACTION

### Count I

### PER SE ILLEGAL GROUP BOYCOTT

### IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)

87. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

88. BridgeMLS's participating brokers and agents are direct competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. They are therefore horizontal competitors with each other and with Compass.

89. Through the Anticompetitive Rules, BridgeMLS forces Compass and its agents to forgo either (1) a critical input to their business (access to BridgeMLS in the BridgeMLS service area) or (2) the ability to offer innovative pre- and off-MLS marketing strategies to homeowners and agents.

90. The agreement by and among BridgeMLS and its participating brokers and agents, together with Bay East and CCAR, to implement and enforce these rules is, therefore, a *per se* group boycott—a *per se* illegal combination, contract, or conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. *Per se* treatment is warranted because BridgeMLS, alone and together with Bay East and CCAR, possesses market power in the MLS Market in Alameda and Contra Costa Counties; it controls access to an input—MLS participation—that agents need to compete effectively in the BridgeMLS service area; and the Anticompetitive Rules lack any plausible efficiency justification, because they govern agents' marketing to the public rather than the integrity or sharing of data within the MLS.

91. As a direct and proximate result of BridgeMLS's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**Count II**

**COMBINATION, CONTRACT, AND CONSPIRACY CONSTITUTING UNREASONABLE RESTRAINT OF TRADE IN VIOLATION OF SHERMAN ACT SECTION 1 (15 U.S.C. § 1)**

92. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

93. BridgeMLS, alone and together with Bay East and CCAR, the MLSs with which it shares a single listing platform in Alameda and Contra Costa Counties, controls access to the MLS services that agents in the BridgeMLS service area need. Membership in BridgeMLS and access to the MLS it operates are critical for agents working in the BridgeMLS service area. BridgeMLS is controlled by agents and brokerages who are horizontal competitors with each other and with Compass in the Brokerage Services Market and the Agent Services Market. BridgeMLS and the agents and brokerages who control it are using their control of BridgeMLS to restrain competition in the Brokerage Services Market and the Agent Services Market by implementing and enforcing the Anticompetitive Rules, which prevent Compass from offering See It First™ on Compass to its homeowner clients and agents and prevent any other agent from offering innovative pre- and off-MLS marketing strategies.

94. The rules' anticompetitive effects—reduced product variety, reduced competition among brokers on the timing, sequence, and scope of listing distribution, and reduced competition for agents—substantially outweigh any pro-competitive benefit. Any legitimate objective could be achieved through substantially less restrictive means, including, on information and belief, rules BridgeMLS offered before May 2020 and the rules of the many MLSs that permit pre-MLS public marketing. Alternatively, the anticompetitive character of the rules is obvious enough to warrant an abbreviated, "quick look" analysis.

95. As a direct and proximate result of BridgeMLS's enforcement of its rules, Compass has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proved at trial.

**Count III**

**COMBINATION IN RESTRAINT OF TRADE**

**IN VIOLATION OF THE CARTWRIGHT ACT**

**(CAL. BUS. & PROF. CODE § 16720 *et seq.*)**

96. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

97. BridgeMLS, Bay East, CCAR, and each of BridgeMLS's participating brokers and agents are each a "person" within the meaning of California Business and Professions Code Section 16702. BridgeMLS's adoption, maintenance, and enforcement of the Anticompetitive Rules is a combination of the capital, skill, or acts of two or more persons—BridgeMLS and its competing participants and subscribers have each agreed in writing to abide by and be bound by its rules—and therefore is a "trust" under Section 16720.

98. The purpose and effect of that combination is to create and carry out restrictions in trade or commerce, in violation of Section 16720(a), by preventing homeowners and their agents in California from publicly marketing listings except through BridgeMLS's distribution and by preventing Compass from offering phased marketing in competition with BridgeMLS's agent-members. The combination is unlawful, against public policy, and void under Section 16726.

99. The combination is a group boycott that is unlawful *per se*. Alternatively, it is an unreasonable restraint of trade because its anticompetitive effects in the relevant markets alleged above substantially outweigh any pro-competitive benefit, which in any event could be achieved through substantially less restrictive means.

100. The combination was formed and carried out in California, is enforced against agents licensed in California, and restrains the marketing of residential real estate located in California.

101. As a direct and proximate result of the combination, Compass has been injured in its business and property, including through lost listing contracts, commissions, and revenue from

ancillary services, and diminished value of its technology platform. Compass' injury flows from that which makes the combination unlawful: the suppression of competition in how, when, and to whom homes are marketed.

102. Under California Business and Professions Code Section 16750(a), Compass is entitled to injunctive relief, three times its damages, interest, and its reasonable attorneys' fees and costs of suit.

## REQUESTED RELIEF

Compass requests the following:

A. A declaration that the Anticompetitive Rules are an unlawful restraint of trade under 15 U.S.C. § 1 and California Business and Professions Code Sections 16720 and 16726;

B. An injunction prohibiting BridgeMLS from adopting, maintaining, or enforcing the Anticompetitive Rules, or any similar rule, to penalize any participant or subscriber for publicly marketing a property that the homeowner has directed be withheld from, or submitted later to, the MLS;

C. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

D. An award of Plaintiffs' attorneys' fees and costs of suit; and

E. Such other relief that the Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Compass hereby demands a trial by jury as to all claims so triable.

Dated: November 12, 2026

By: */s/ Joseph Tartakovsky*

Joseph Tartakovsky (SBN: 282223)
jtartakovsky@eimerstahl.com
EIMER STAHL LLP
71 Stevenson Street, Suite 400
San Francisco, CA 94105
Telephone: 415-508-8801

Nathan P. Eimer (*pro hac vice forthcoming*)
neimer@eimerstahl.com
Vanessa G. Jacobsen (*pro hac vice forthcoming*)
vjacobsen@eimerstahl.com
Alec Solotorovsky (*pro hac vice forthcoming*)
asolotorovsky@eimerstahl.com
EIMER STAHL LLP
224 South Michigan Avenue, Suite 1100
Chicago, IL 60604
Telephone: 312-660-7600

Brian Y. Chang (SBN: 287757)
bchang@eimerstahl.com
EIMER STAHL LLP
1999 South Bascom Avenue, Suite 1025
Campbell, CA 95008
Telephone: 408-889-1670

*Attorneys for Plaintiffs*
*Compass, Inc. and*
*Compass California II, Inc.*